UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:17-CV-00489-GNS-RSE

DAVID MALAGESE and
GABRIELLE CHAPPELL, individually and
on behalf of all persons similarly situated                                    PLAINTIFFS

v.

FIFTH THIRD BANK, N.A.                                                          DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment (DN 73). The motion is now ripe for adjudication. For the reasons that follow, Defendant's motion is **GRANTED**.

## I.      BACKGROUND

Plaintiffs David Malagese ("Malagese") and Gabrielle Chappell ("Chappell") bring this putative class action on behalf of themselves and those similarly situated against Defendant Fifth Third Bank, N.A. ("Fifth Third"), asserting claims for breach of contract. (Second Am. Class Action Compl. ¶¶ 35-39, DN 53). Specifically, Plaintiffs assert that Fifth Third improperly charged them overdraft fees. (Second Am. Class Action Compl. ¶¶ 1-2). Fifth Third moves for summary judgment. (Def.'s Mot. Summ. J. 1, DN 73).

## II.     JURISDICTION

Both parties agree that subject matter jurisdiction is proper here under the Class Action Fairness Act. (Joint Stipulation ¶ 14, DN 82); *see* 28 U.S.C. § 1332(d)(2), (5)(B), (6). 28 U.S.C. § 1332(d)(2)(A) requires only one plaintiff to be a citizen of a different state than one defendant. Malagese is a citizen of Kentucky and Chappell is a citizen of Indiana, while Fifth Third Bank is

headquartered with its principal place of business in Ohio.  (Second Am. Class Action Compl. ¶¶ 6-8).  The parties agree that the $5 million amount in controversy requirement is satisfied here and that the proposed class exceeds 100 members.  (Joint Stipulation ¶ 14); *see* 28 U.S.C. § 1332(d)(5)(B), (6).[1]

### III.     STANDARD OF REVIEW

In ruling on a motion for summary judgment, the Court must determine whether there is any genuine issue of material fact that would preclude entry of judgment for the moving party as a matter of law.  *See* Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of stating the basis for the motion and identifying evidence in the record that demonstrates an absence of a genuine dispute of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  If the moving party satisfies its burden, the non-moving party must then produce specific evidence

---

[1] Upon initial review of the Complaint, the Court questioned the satisfaction of the amount in controversy requirement.  (Order, DN 81).  In conceding that the amount in controversy requirement was satisfied here, Fifth Third noted:

> Based on [the] nature of the Plaintiffs' claims for breach of contract and the proposed class definition of a putative nationwide class going back nearly nine years, Fifth Third has cursorily reviewed its records and agrees with Plaintiffs that nationwide, there would be more than 100 class members in the putative nationwide class . . . and that the amount in controversy for the putative class would exceed $5 million . . . .

(Joint Stipulation ¶ 13).  It appears that Fifth Third recognizes that its national presence, coupled with its nationwide process for charging overdraft fees and the purported damages flowing from that allegedly wrongful process, sufficiently establishes the $5 million amount in controversy requirement, considering the number of customers it has had and the number of times it charged overdraft fees during those nine years.  *See also Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 155 n.2 (6th Cir. 1993) (recognizing that a party's affirmative and explicit concession that the amount in controversy requirement is met may be sufficient in some cases to establish that requirement), *overruled on other grounds by Hertz Corp. v. Friend*, 559 U.S. 77, 92-93 (2010).

proving the existence of a genuine dispute of fact for trial.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

While the Court must view the evidence in the light most favorable to the non-moving party, that party must do more than merely show the existence of some "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted).  Rather, the non-moving party must demonstrate that a genuine factual dispute exists by "citing to particular parts of the materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute . . . ."  Fed. R. Civ. P. 56(c)(1).  "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient" to overcome summary judgment.  *Anderson*, 477 U.S. at 252.

## IV.   DISCUSSION

The parties' entire dispute rests on whether Fifth Third properly charged Plaintiffs with overdraft fees pursuant to the terms of their contracts.  In a putative class action lawsuit based on diversity jurisdiction, state substantive law applies.  *See generally Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 398-99 (2010).  The parties do not dispute the application of Ohio substantive law to Plaintiffs' claims, pursuant to the terms of their contracts, and also acknowledge that whether Ohio or Kentucky law applies is immaterial because the jurisprudence of both states governing breach of contract claims do not materially differ.  (Def.'s Mot. Summ. J. 15; Pl.'s Resp. Def.'s Mot. Summ. J. 3, DN 74); *see generally Becker v. Direct Energy, LP*, 112 N.E.3d 978, 988 (Ohio Ct. App. 2018); *EQT Prod. Co. v. Big Sandy Co., L.P.*, 590 S.W.3d 275, 293 (Ky. App. 2019).  The Court will therefore look to Ohio substantive law in adjudicating Plaintiffs' breach of contract claims.

Malagese opened a checking account with Fifth Third on March 1, 2013, and Chappell opened her account on July 13, 2011.  (Def.'s Mot. Summ. J. 2-3; Def.'s Mot. Summ. J. Ex. A, DN 73-1; Def.'s Mot. Summ. J. Ex. B, DN 73-2; Pls.' Resp. Def.'s Mot. Summ. J. 3, DN 74).  By doing so, Malagese and Chappell agreed to the terms and conditions set forth in the "Rules and Regulations Applicable to All Fifth Third Consumer and Business Banking Accounts and Cards" ("Rules and Regulations").  (Def.'s Mot. Summ. J. 2; Pls.' Resp. Def.'s Mot. Summ. J. 5; Def.'s Mot. Summ. J. Ex. A; Def.'s Mot. Summ. J. Ex. B).  The parties' dispute centers on the interpretation of the Rules and Regulations against a series of transactions executed by Plaintiffs that resulted in the issuance of overdraft fees against them.  "[C]ontract interpretation is normally a question of law" and only "becomes a question of fact when an ambiguous term necessitates the introduction of extrinsic evidence to interpret the contract." *Maverick Oil & Gas, Inc. v. Barberton City Sch. Dist. Bd. of Educ.*, 872 N.E.2d 322, 613 (Ohio Ct. App. 2007) (citation omitted).

### A.      Malagese's September 11, 2015, Overdraft Fee

The first sets of transactions at issue by Malagese gave rise to an overdraft fee charged on September 11, 2015.  On that day, Malagese possessed a beginning balance of $117.16 in his checking account.  (Def.'s Mot. Summ. J. Ex. G, at 2, DN 73-7).  He deposited a check for $1,183.83 and made two transfers from his savings account to his checking account totaling $600. (Def.'s Mot. Summ. J. Ex. G, at 3).  Malagese made three debit card purchases two days earlier which were finalized on September 11 for a total of $20.39, in addition to a September 11 "merchant payment" at Walmart for $131.50.  (Def.'s Mot. Summ. J. Ex. G, at 3).  Finally, Malagese wrote a check for $1,450.  (Def.'s Mot. Summ. J. Ex. G, at 3).  Simply totaling deposits and subtracting the debits on that day would yield a positive account balance, which would have avoided an overdraft charge.  The terms of the Rules and Regulations, however, provide that only

$100 of an account holder's standard check deposit is available for use on the date of the deposit. Because only $100 of the $1,183.83 check Malagese deposited was usable on September 11, Malagese's net transactions that day actually resulted in a negative balance of $784.73.

The Rules and Regulations contain Fifth Third's "Funds Availability Policy" which outlines "[w]hen funds deposited to your account are available." (Def.'s Mot. Summ. J. Ex. D, at 7). For check deposits, "[u]p to $100 of the total of your check deposits for the day will be available on the day we receive the deposit. Remaining funds will be available on the first Business Day after the day we receive your deposit." (Def.'s Mot. Summ. J. Ex. D, at 7). Two other sections, "Funds Availability Policy for Transaction Accounts" and "Availability of Other Check Deposits[,]" discuss when certain funds become available. (Def.'s Mot. Summ. J. Ex. D, at 21). Specifically, for checks deposited in consumer accounts:

> Up to $100 of the total of your check[2] deposits for the day made in any manner (including branch, ATM, etc.) will be immediately available to you on the day we receive the deposit. The remaining funds will be available on the first business day after the day we received the deposit. For example, if you deposit a check o[f] $700 on Monday prior to the cut off time, $100 of the deposit will be available on Monday. The remaining $600 will be available on Tuesday.

(Def.'s Mot. Summ. J. Ex. D, at 21). Thus, Fifth Third's funds availability policy clearly specifies that only $100 of a standard check deposited is available for use by the account holder on the date of deposit, which supports Fifth Third's imposition of the overdraft charges at issue to Malagese.

Malagese asserts that Fifth Third should have considered the entirety of the check he deposited on September 11, not simply $100, in determining whether he had sufficient funds in his account. In support of his argument Malagese selectively cites certain statements from the

---

[2] "Check" as used here is any check that is not a U.S. Treasury check, Federal Reserve Bank check, Federal Home Loan Bank check, state or local government check, or cashier's or certified check, or a postal money order. (Def.'s Mot. Summ. J. Ex. D, at 21).

Rules and Regulations, which initially contain a synopsis of Fifth Third's overdraft policies, this is expounded in greater detail in Section 13 of that contract.  (Def.'s Mot. Summ. J. Ex. D, at 6-7, 14-16).  Malagese points to two statements from Section 13:  "You can avoid overdraft situations by always making sure you have sufficient funds in your account to cover all of the debits (-) you make" and "[i]f there is not enough money in your account at the end of the day to cover all of your posted debits (-), then we consider transactions [in determining whether an overdraft has occurred] in the following order . . . ."  (Pls.' Resp. Def.'s Mot. Summ. J. 5, DN 74; Def.'s Mot. Summ. J. Ex. G, at 7, 14-15).  Malagese contends these statements are conditions precedent to the application of Fifth Third's overdraft policies—in other words that Fifth Third can only charge an overdraft fee if an account does not contain "sufficient funds" or "enough money" as determined by the "ledger balance" showing the entirety of all deposits.  (Pls.' Resp. Def.'s Mot. Summ. J. 2). Such an interpretation, however, ignores Fifth Third's funds availability policy outlined above that only the first $100 of a deposited check is available for use on the date of deposit.  (Def.'s Mot. Summ. J. Ex. D, at 7, 21).  There is simply nothing in the Rules and Regulations precluding application of the funds availability policy in determining whether an account holder possesses "sufficient funds" or "enough money in [his or her] account", which is highlighted by Malagese's failure to point to any portion of the Rules and Regulations to support his contention.  *See Kaminsky v. New Horizons Comput. Learning Ctr. of Cleveland*, 62 N.E.3d 1054, 1059 (Ohio Ct. App. 2016) ("A court is to examine the contract as a whole and presume that the intent of the parties is reflected within the contract language itself."  (citation omitted)).

The Rules and Regulations dictate when deposited funds are available for an account holder's use regardless of what an account holder's "ledger balance" may show.  (Def.'s Mot. Summ. J. Ex. D, at 21); *see Potti v. Duramed Pharm., Inc.*, 938 F.2d 641, 647 (6th Cir. 1991)

("Ambiguity exists only where a term cannot be determined from the four corners of the agreement or where contract language is susceptible to two or more reasonable interpretations." (citing *Wells v. Am. Elec. Power Co.*, 548 N.E.2d 995 (Ohio Ct. App. 1988))).  The interpretation of "sufficient funds" and "enough money" is simple and unambiguous—funds over $100 from a standard check deposited into an account are not "available" for an account holder's use on the date of deposit and thus cannot be considered "funds" or "money" until the next business day.

Malagese argues that the funds availability policy does not discuss the meaning of the word "available" and is ambiguous as to whether "available" funds encompass all of the funds of a deposited check on the date of deposit.  (Pls.' Resp. Def.'s Mot. Summ. J. 6; Def.'s Mot. Summ. J. Ex. G, at 21).  Although the funds availability policy does not define "available", "common words appearing in a written instrument are to be given their plain and ordinary meaning . . . ." *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, 246-47 (Ohio 1978) (citations omitted). "Available" means "present or ready for immediate use . . . ." *Available Definition*, Merriam-Webster.com, https://www.merriamwebster.com/dictionary/available (last visited Apr. 28, 2020); *see City of Marietta v. Bd. of Comm'rs of Wash. Cty.*, No. 19-CA-1, 2019 WL 4701861, at *3-4 (Ohio Ct. App. Sept. 19, 2019) ("Appellant appropriately cites the online edition of Merriam-Webster's Dictionary for the definition of [a word] in common usage." (citation omitted)). Construing the term "available" to include funds from a check that has not yet been cleared would directly conflict with the ordinary meaning of "available" and render that term meaningless— funds that have not yet been determined to validly exist cannot be deemed ready for an account holder's immediate use. *See Christe v. GMS Mgmt. Co.*, 705 N.E.2d 691, 693 (Ohio Ct. App. 1997) ("Courts should attempt to harmonize provisions and words so that every word is given effect." (citation omitted)).

Malagese posits that because Fifth Third reserved the right to reject transactions that result in an overdraft, Fifth Third should possess only that right and not the ability to charge overdraft fees; in that way, the purpose of the funds availability policy would be effected without having to charge account holders overdraft fees.  (Pls.' Resp. Def.'s Mot. Summ. J. 14).  This construction would thwart the plain language of the Rules and Regulations that an account holder is subject to both overdraft fees and transaction rejections.  *See Caldeway Props., Inc. v. Bayview Loan Servicing, LLC*, 338 S.W.3d 280, 286, (Ky. App. 2010) ("An unambiguous written contract must be strictly enforced according to the plain meaning of its express terms and without resort to extrinsic evidence."  (citation omitted)); (Def.'s Mot. Summ. J. Ex. D, at 16).  Charging overdraft fees effects the funds availability policy in the same way that the right to reject transactions does— reinforcing to an account holder that he or she cannot use more than $100 from an unverified check on the date of the deposit without consequences.

For these reasons, no reasonable account holder would believe that he or she could use more than $100 from a check whose funds will be verified the next business day without being subject to overdraft fees.  Malagese was properly charged an overdraft fee on September 11.

**B.**   **Malagese's June 4, 2014 and Chappell's October 1, 2015, Overdraft Fees**

Malagese identifies in response to Fifth Third's motion another series of transactions occurring on June 4, 2014,[3] that he asserts resulted in wrongful overdraft fees.  (Pls.' Resp. Def.'s Mot. Summ. J. 7).  Malagese outlines the following transactions:  (1) a beginning balance of $723.93; (2) $1,149.96 in deposits, including a $1,146.97 check; and (3) purchases of $17.56,

---

[3] Although this set of transactions would be governed by the 2014 version of the Rules and Regulations instead of the 2015 version discussed above, "Plaintiffs agree that the April 2014 and May 2015 Rules and Regulations are 'substantially the same for purposes of this Motion' with regard to the contractual language at issue in this case."  (Pls.' Resp. Def.'s Mot. Summ. J. 5 n.2 (citation omitted)).

$12.99, $600, $200, and $200, considered as debits on June 4.  (Pls.' Resp. Def.'s Mot. Summ. J. 7; Pls.' Resp. Def.'s Mot. Summ. J. Ex. A, at 2-3, DN 74-3).  Malagese can only be deemed to have sufficient funds in his account if it is assumed that all of the funds from the $1,146.97 check were available on the date of deposit.  As before, only $100 of that check was available for use on that date, per Fifth Third's funds availability policy.  Thus, the beginning account balance of $723.93 increased to $823.93 by the $100 credit, but decreased to a negative balance of $206.62 after all the debits.  Malagese was therefore properly charged overdraft fees on this day.

Malagese claims another instance of improper overdraft fees, which mirrors part of Chappell's challenge and involves the overdraft calculation order policy in the Rules and Regulations.  (Pls.' Resp. Def.'s Mot. Summ. J. 7-8; Def.'s Mot. Summ. J. Ex. D, at 7, 15).  In determining whether to assess an account holder with an overdraft fee on a particular day, Fifth Third starts with the account holder's "ending Daily Balance from the prior business day" plus any "credits." (Def.'s Mot. Summ. J. Ex. D, at 15).  Then, in chronological order are deducted "posted Timestamped Debits", such as posted ATM withdrawals, debit Card purchases, and online/telephone transfers to another Fifth Third account.  (Def.'s Mot. Summ. J. Ex. D, at 15).  Next, from largest amount to smallest amount, "posted Batch Debits" are deducted; examples of these include:  posted written checks, posted online/telephone transfers to a non-Fifth Third account, Internet banking bill payments, outgoing ACH transfers (automatic bill payments), and outgoing wire transfers.  (Def.'s Mot. Summ. J. Ex. D, at 15).  Finally, fees and service charges are deducted.  (Def.'s Mot. Summ. J. Ex. D, at 15).

Malagese was charged two overdraft fees on June 4.  (Pls.' Resp. Def.'s Mot. Summ. J. Ex. A, at 3).  Malagese's account that day began with a balance of $723.93, plus a $100 credit pursuant from his check deposit, yielding an available balance of $823.93.  (Pls.' Resp. Def.'s Mot. Summ.

J. Ex. A, at 2-3).  Debits that day to Malagese's account included two posted timestamped debits for debit card transactions of $17.56 and $12.99, for a balance of $793.38.  (Pls.' Resp. Def.'s Mot. Summ. J. Ex. A, at 3).  Malagese does not dispute the characterization of these debits as "posted Timestamped Debits[,]" which are to be subtracted from Malagese's balance before "posted Batch Debits" per the order of calculation provision of the overdraft calculation policy.  (Def.'s Mot. Summ. J. Ex. D, at 15).  There were three posted batch debits consisting of "web initiated" transactions for $600, $200, and $200.  (Pls.' Resp. Def.'s Mot. Summ. J. Ex. A, at 3).  Per Fifth Third's overdraft calculation policy, posted batch debits are deducted in order of largest to smallest amount, not in the order of transaction time.  (Def.'s Mot. Summ. J. Ex. D, at 15).  Considering each posted Batch Debit transaction, Malagese's balance declined first by $600 from $793.38 to $193.38, then by $200 from $193.38 to a negative balance of $6.62, and finally by another $200 to a further negative balance of $206.62.  Per Fifth Third's overdraft fee policy, an account holder is charged for each separate transaction that results in a negative balance, not simply a one-time overdraft fee reflective of the entirety of the negative balance accumulated that day.  (Def.'s Mot. Summ. J. Ex. D, at 6).  So, Malagese was charged two overdraft fees of $37, totaling $74.

Regarding Chappell, her account began with a balance of $59.72 on October 1, 2015, and a $37.10 debit card transaction was debited from the previous day.  (Def.'s Mot. Summ. J. Ex. H, at 3).  Chappell does not dispute the characterization of this purchase as a posted timestamped debit that was properly deducted on October 1, which reduced Chappell's available balance to $22.62.  Chappell also made two "web initiated payment[s]" that day, one for $45 and one for $16.  (Def.'s Mot. Summ. J. Ex. H, at 2-3, DN 73-8). Because  these transactions were "posted Batch Debits" subtracted in order of largest to smallest, Chappell was charged with two overdraft fees, first for creating a negative overdraft balance of $22.38 for the $45 payment and a second $37

overdraft fee for increasing her negative overdraft balance to $38.38 for the $16 payment.  (Def.'s Mot. Summ. J. Ex. H, at 3).[4]

Chappell argues that Fifth Third improperly charged her two overdraft fees by debiting the $45 payment first—had Fifth Third debited the $16 charge first, Chappell would have only acquired one overdraft fee.  (Pls.' Resp. Def.'s Mot. Summ. J. 19).  Malagese makes this argument, as well—had Fifth Third first subtracted the two $200 charges before subtracting the $600 charge, Malagese would have overdrafted only once instead of twice.  Chappell and Malagese's argument only holds water if the payments in question were not "posted Batch Debits[,]" which are subtracted in order from largest to smallest payments, not temporally.  These transactions, however, were properly characterized as posted batch debits.  Chappell's $45 and $16 payments and both of Malagese's $200 charges are identified as "web initiated payment[s]."  (Pls.' Resp. Def.'s Mot. Summ. J. Ex. A, at 3; Def.'s Mot. Summ. J. Ex. H, at 3).  The Rules and Regulations specifically state that web-based/Internet bill payments are deemed to be batch debits, which fully supports the treatment of the transactions by Fifth Third.  (Def.'s Mot. Summ. J. Ex. D, at 7, 15).

Plaintiffs' attempted use of extrinsic evidence to create ambiguity or alter these conclusions is rejected.  Although Plaintiffs point to account statements and testimony of Fifth Third employees to support their assertions that the entirety of a check's funds should be considered by Fifth Third for overdraft calculation purposes and that the order of web initiated debits should be different, only the Rules and Regulations may be considered to give meaning to the terms listed above and the overdraft calculation order.  *See Sunoco, Inc. (R&M) v. Toledo Edison Co*., 953 N.E.2d 285, 298 (Ohio 2011) ("[E]xtrinsic evidence cannot be considered to give effect to the contracting

---

[4] Fifth Third actually reversed the $74 in overdraft charges, crediting Chappell's account with $74 on October 2.  (Def.'s Mot. Summ. J. Ex. J, at 4, DN 73-10).

parties' intentions when the language of the contract is clear and unambiguous."   (citation omitted)).

Further, "[a] court must construe a contract against its drafter, . . . when the terms are unambiguous and clear on their face, the court need not look beyond the plain language of the contract in order to determine the rights and obligations of the parties."  *Beasley v. Monoko, Inc.*, 958 N.E.2d 1003, 1012 (Ohio Ct. App. 2011) (citation omitted).  Although Plaintiffs generally argue that the Rules and Regulations must be construed against Fifth Third as the drafter, there is no ambiguity therein.  (Pls.' Resp. Def.'s Mot. Summ. J. 18).

Fifth Third properly applied the Rules and Regulations to charge Plaintiffs with overdraft fees.  Although Plaintiffs assert that the sets of transactions highlighted above are illustrative of Fifth Third's illegal practices, Plaintiffs have offered no other proof to support their claims that Fifth Third has improperly overcharged fees to its customers.  (Pls.' Resp. Def.'s Mot. Summ. J. 6 n.3).  Fifth Third did not breach its contracts with Plaintiffs, so summary judgment will be granted in Fifth Third's favor on all of Plaintiffs' claims, which will be dismissed with prejudice.  *See Rivera v. PNS Stores, Inc.*, 647 F.3d 188, 194 (5th Cir. 2011) (dismissing claim with prejudice on motion for summary judgment after recognizing that "[s]ummary judgment . . . is the procedural equivalent of a trial and is an adjudication of the claim on the merits."  (citation omitted)).

C.    **Putative Class**

Plaintiffs' putative class has not been certified in this case.  Plaintiffs never moved for class certification, nor have Plaintiffs argued that this case should remain active even if their individual claims are dismissed.  "It has never been doubted that a complaint asserting a class action could be dismissed on the merits before determining whether the suit could be maintained as a class action."  *Marx v. Centran Corp.*, 747 F.2d 1536, 1552 (6th Cir. 1984) (citations omitted).  "It is

reasonable for a district court to consider a motion for summary judgment before reaching a motion for class certification when resolution of the former is likely to prevent 'needless and costly further litigation.'" *Canaday v. Kelley*, 37 F.3d 1498, 1994 WL 567512, at *7 (6th Cir. 1994) (citations omitted).

Because summary judgment will be granted in Fifth Third's favor, this entire action may be properly dismissed. *Id.*; ("In this case, the district court's disposition of plaintiff's claims left the court without substantial federal claims to consider. Therefore, no other issues remained to be settled in a federal court, and the issue of class certification was moot."); *see also Crosby v. Bowater Inc. Ret. Plan for Salaries Emps. of Great N. Paper, Inc.*, 382 F.3d 587, 597 (6th Cir. 2004) ("If [a] class action is to be maintained, . . . there must be 'a named plaintiff who has such a case or controversy at the time the complaint is filed and at the time the class action is certified.'" (citation omitted)); 1 Joseph M. McLaughlin, *McLaughlin on Class Actions* § 4:28 (16th ed. Oct. 2019 update) ("There is consensus that if the named plaintiff's claim . . . is dismissed before he or she moves for class certification, dismissal of the action is required because putative members of an uncertified class have no cognizable legal stake in the controversy . . . ." (citations omitted)).[5] The entirety of this action may therefore be dismissed.

## V.    CONCLUSION

For the reasons set forth above, **IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment (DN 73) is **GRANTED**. All of Plaintiffs' claims against Defendant are

---

[5] It is possible for a putative class action lawsuit to continue even when the named plaintiffs' claims are dismissed, but it appears that such is the case only if an exception to the mootness doctrine applies. *See generally Wilson v. Gordon*, 822 F.3d 934, 942-52 (6th Cir. 2016). Plaintiffs have made no argument for the continuing of this action even after Malagese and Chappell's claims have been dismissed. In any event, none of the mootness exceptions would apply here.

**DISMISSED WITH PREJUDICE**.  The Clerk is directed to strike this matter from the active

docket.

Greg N. Stivers, Chief Judge

United States District Court

May 26, 2020

cc:      counsel of record

14